State of Vermont v. Green Mountain Future, No. 758-10-10 Wncv (Crawford, J. June 28, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

SUPERIOR COURT                           CIVIL DIVISION
WASHINGTON UNIT                          DOCKET NO.: 758-10-10 Wncv

STATE OF VERMONT

v.

GREEN MOUNTAIN FUTURE

### DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case presents a single constitutional issue:

Does the First Amendment excuse a political action committee which runs a negative ad about a candidate from compliance with Vermont's election laws requiring certain disclosures by political organizations even though the ads do not expressly advise the populace to "vote against" the candidate?

The facts are not in dispute, and both sides have moved for summary judgment.

### FACTS

Green Mountain Future is an issue advocacy organization registered with the Internal Revenue Service. Its filing with the IRS discloses a post office box address in Barre, Vermont. During the month of September 2010, it reported contributions of $533,955 and expenditures of $429,186. Almost all contributions were made by the Democratic Governors Association. The expenditures were principally for media production and "buy" in connection with two television advertisements which aired in September and October 2010.

The scripts for the two advertisements appear in the record. Both focus on the positions of then-Lieutenant Governor Dubie concerning licensing of the Vermont Yankee nuclear power plant in Vernon, Vermont. The advertisements are strongly negative in tone. They open with statements about the leakage of radioactive material at the plant. They report that Lt. Governor Dubie favors keeping the plant open. They conclude with the statements "Vermont Yankee open another 20 years would be a disaster. Tell Brian Dubie he's wrong about Vermont Yankee" and "Want Vermont Yankee open another 20 years? Tell Brian Dubie no."

### Procedural History

The State filed this action seeking a declaration that Green Mountain Future is in violation of Vermont election disclosure laws by failing to register with the state as a

political committee (17 V.S.A. § 2831), failing to file reports (17 V.S.A. § 2811), and failing to include its address in the two advertisements (17 V.S.A. § 2892).  In addition, it seeks civil penalties for each failure to comply.

Green Mountain Future filed a counterclaim in which it challenged the state's efforts to regulate it as a political committee and to require it to place its name and address on the advertisements as violations of the First Amendment and the Due Process Clause of the Fourteenth Amendment.  The constitutional claims have two aspects: first, that the First Amendment prohibits state regulation of issue advocacy and, second, that Vermont's registration and disclosure requirements are overly broad and too vague to be enforced.

ANALYSIS

The motions for summary judgment raise both statutory and constitutional questions. The court will consider these in the following order:

1. Do the registration and disclosure requirements in the Vermont election law apply to the activities of Green Mountain Future in running the two ads concerning Lt. Gov. Dubie's position on Vermont Yankee?

2. Do these statutory requirements pass the "exacting scrutiny" test required by the U.S. Supreme Court for the regulation of speech in this context?

3. Are these provisions too vague or overly broad to be enforced—either on their face or "as applied" in this case?

1. Application of the Vermont election law to Green Mountain Future and the Vermont Yankee advertisements.

The State seeks to enforce two provisions of the Vermont campaign finance laws.  17 V.S.A. § 2831 requires any political committee or party spending more than $500 to register with the Secretary of State.  17 V.S.A. §§ 2891–2893  require the sponsor of any "electioneering communication" to provide its name and address as part of the communication, to file a report with the Secretary of State, and to provide a copy of the report to any candidate named or shown in the communication.  This is commonly known as a "disclaimer" requirement.  Both statutory requirements contain their own definitional provisions.

A.  Registration of the PAC

The registration of political committees or "PACs" is governed by 17 V.S.A. §§ 2801, 2831.  (Intervening provisions concerning contributions to candidates and their campaigns are not relevant.)  Section 2801(4) defines a political committee as:

2

Any formal or informal committee of two or more individuals, or a corporation, labor organization, public interest group, or other entity, not including a political party, which receives contributions of more than $500 and makes expenditures of more than $500 in any one calendar year *for the purpose of supporting or opposing one or more candidates, influencing an election, or advocating a position on a public question in any election or affecting the outcome of an election.* (emphasis supplied)

Section 2831 requires such political committees to register with the Vermont secretary of state as soon as their funds reach the $500 threshold. A PAC subject to registration must provide its full name, address, the name of its treasurer, and the name of its bank. There is a separate requirement for reporting expenditures after they are made to the election authorities at the state and local levels.

In its Statement of Undisputed Material Facts, Green Mountain Future describes itself as "an independent issue advocacy organization registered with the Internal Revenue Service." It denies making any expenditure that required it to register as a political committee or file disclosure reports with the Secretary of State. It admits that its expenditures exceeded $500. It denies that its ads expressly advocate the election or defeat of any candidate. "The communications do not include any words of express advocacy such as 'vote for' or 'vote against.' Its communications do not include references to any election, voting, campaigns, or even mention that any person in the ad is a candidate for office." Green Mountain Future's Memo in support of motion for summary judgment at 6 (filed Feb. 15, 2011).

Factually, the court applies an objective standard. *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469 (2007). It is not necessary to determine the subjective intent of the leadership of the PAC in deciding to place the advertisements. The court looks instead at the content of the advertisements to determine whether the language and images demonstrate a purpose of supporting or opposing a candidate or influencing the outcome of the election.

It would require the cheerful credulity of a very young child to conclude that the two political advertisements, prominently featuring Lt. Governor Dubie's name and photograph and aired just prior to the gubernatorial election, had neither the intention nor the effect of advocating against his election. In resolving a motion for summary judgment, the court is not required to accept the bare denial of the party opposing the motion. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28 (1999) ("mere conclusory allegations without facts to support them" are insufficient to oppose summary judgment). In this case, the court will draw the obvious inference from the undisputed facts that the advertisements, objectively viewed, were created and broadcast for the purpose of opposing a candidate.

Setting aside for a moment the defendant's constitutional objections to the registration requirement, it is clear without any need for testimony or additional evidence that Green Mountain Future's activities in Vermont, specifically the expenditure of almost a half-

3

million dollars to run two ads attacking Lt. Governor Dubie's position on Vermont Yankee, meet the statutory criteria for a PAC subject to registration under 17 V.S.A. § 2831. Both ads oppose a candidate in an election. Both ads fall clearly within the types of political activity which trigger the registration requirement for the PAC which runs the ad.

Similarly, the two advertisements meet the statutory definition of "electioneering communications" subject to disclaimer and reporting requirements which appear at 17 V.S.A. §§ 2891–2893. They were broadcast on television. They refer to a clearly identified candidate for office. They plainly oppose Mr. Dubie's fitness for office by raising questions about his judgment and policy choices. They are "attack ads"— completely legal, commonly used by all sides in the current political environment, and subject to the statutory requirement that their sponsor provide its name and address as part of the ad and report the expenditure to the election authorities and Mr. Dubie.

With respect to the disclosure requirement, Green Mountain Future also contends that listing its web address is sufficient to satisfy the requirement to provide its address. The statutory language is clear. The purpose of the "name and address" requirement is to enable voters to know who paid for the communication and to facilitate enforcement. See 1997, No. 64, § 1 ("Identification of persons who publish political advertisements assists in enforcement of the contribution and expenditure limitations established by this act."). The plain and ordinary meaning of "address" in the expression "name and address" is a physical or mailing address, either of which aids in identification. A web address merely guides one to a website that says whatever its author chooses, does not necessarily identify anyone, and can easily be used to mislead the viewer. "Address" means physical or mailing address.

The court answers its first question in the affirmative. The undisputed evidence submitted by both sides demonstrates that Green Mountain Future spent considerably more than $500 to run two ads which opposed a candidate for public office. These facts required registration and disclosure unless the court holds the election law provisions to be unconstitutional.

   2. First Constitutional Challenge: "Exacting Scrutiny."

Three U.S. Supreme Court decisions dominate the field of constitutional challenge to the requirements of registration and disclosures by political committees. These are *Buckley v. Valeo*, 424 U.S. 1 (1976); *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003); and *Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010). All three cases concern challenges to federal election statutes, but the constitutional principles apply equally to the regulation of election activities under state law.[1] These

---

[1] In reviewing these cases, the court has in mind the different treatment of legislation which restricts *contributions* to political parties and committees, *direct expenditures* for political speech, and legislation which requires *registration and disclosure* of the identities of individuals and associations engaged in political spending. Over time the U.S. Supreme Court has developed different constitutional tests for these three areas of regulation. The statutory provisions at issue in this case concern only the registration and

cases establish beyond any reasonable dispute that disclosure and disclaimer requirements of campaign-related expenditures by PACs are constitutional under the "exacting scrutiny" test because these measures are necessary to inform the electorate about the source of contributions and the true origins of political advertising.

In *Citizens United,* the Supreme Court unequivocally endorsed the constitutionality of disclosure and disclaimer requirements under the exacting scrutiny standard.

> Disclaimer and disclosure requirements may burden the ability to speak, but they "impose no ceiling on campaign-related activities," and "do not prevent anyone from speaking," The Court has subjected these requirements to "exacting scrutiny," which requires a "substantial relation" between the disclosure requirement and a "sufficiently important" governmental interest.
>
> In *Buckley,* the Court explained that disclosure could be justified based on a governmental interest in "provid[ing] the electorate with information" about the sources of election-related spending. The *McConnell* Court applied this interest in rejecting facial challenges to BCRA §§ 201 and 311. There was evidence in the record that independent groups were running election-related advertisements "'while hiding behind dubious and misleading names.'" The Court therefore upheld BCRA §§ 201 and 311 on the ground that they would help citizens "'make informed choices in the political marketplace.'"

*Citizens United v. Federal Election Commission*, 130 S.Ct. 876, 914 (citations omitted).

Turning to the Vermont provisions, the analysis is identical. Both the registration requirement imposed by 17 V.S.A. § 2831 and the disclaimer requirements imposed by 17 V.S.A. §§ 2891–2893 impose a degree of regulation on political speech. They neither prohibit the speech nor regulate its content. As this case demonstrates, however, they are not welcomed by those subject to the regulation because they place a burden on activities by political committees which have come to be recognized as legal in our democracy. For this reason, they are subject to an intermediate level of "exacting scrutiny"—less than "strict scrutiny" reserved for inherently suspect legislation and greater than the standard applied to the police power of the states in other legislative areas.

The same "exacting scrutiny" review which the Supreme Court applied to successive versions of the federal election statute in *Buckley*, *McConnell*, and *Citizens United* establishes the constitutionality of the Vermont disclosure and disclaimer provisions. Like the federal requirements, these provide information to the electorate. They require disclosure of the true sponsor of an advertisement. Voters who watch TV ads can investigate the source of the information they receive if the ad provides disclosure and the

---

disclosure of spending by Green Mountain Future and the related disclaimer issue (mandatory identification of the source of an advertisement).

5

Secretary of State provides registration.  The burden on Green Mountain Future is minimal and, as its memo demonstrates, consistent with IRS reporting requirements with which it already complies. Setting aside the vagueness challenge for a moment, the disclosure and disclaimer requirements impose a minimal burden of compliance to achieve greater honesty and transparency in our politics.  By any measure, this trade-off meets the "exacting scrutiny" test imposed on such statutes.

3.  Second constitutional challenge: vagueness and overbreadth

Since disclosure and disclaimer requirements have consistently been held to pass the "exacting scrutiny" test, those opposed to such requirements have focused principally on claims of vagueness and overbreadth.  In other words, they argue—as here—that while it may lie within the power of the legislature to impose disclosure and disclaimer requirements, the laws are either too vague to give fair notice to a political committee that its ad triggered the requirements or too broad in the sense that it imposed requirements on groups not involved in activities related to campaigns and elections.

A.  *Buckley*, *McConnell*, and *Citizens United*

The development of a test or standard for vagueness and overbreadth for disclosure and disclaimer requirements begins with the *Buckley* decision in 1976, which upheld requirements of political spending by individuals or associations which appeared in the Federal Election Campaign Act of 1971, 86 Stat. 3, as amended by the FECA Amendments of 1974, 88 Stat. 1263.  The Court held that such requirements could be saved from challenges of "vagueness" and "overbreadth" only if they were construed to apply only to "express advocacy" on behalf of a candidate.

The *Buckley* Court developed this "savings construction" in the "contribution and expenditure limitations" portion of the opinion.  The Court found vague the expression "any expenditure . . . relative to a clearly identified candidate" in 18 U.S.C. § 608(e)(1), which it interpreted to refer to "advocating the election or defeat of" a candidate.[2] *Buckley*, 424 U.S. at 42.  "Expenditure" itself was separately defined as a payment "made for the purpose of influencing" an election.  18 U.S.C. § 591(f)(1).  *Buckley* interpreted § 608(e)(1) narrowly to include only advertisements or similar expenses which contained an *explicit* direction to vote for or against a candidate ("All the way with LBJ").  By grafting the express advocacy limitation onto the more general language of the definitions, the *Buckley* decision created a bright line between expenditures treated as addressing public issues, which are protected from regulation by the First Amendment, and those which expressly support or oppose individual candidates, which are appropriately subject to regulation.  Later in the opinion, the Court imported the savings construction of 18 U.S.C. § 608(e)(1) into the separately defined "expenditure" that triggered the disclosure and reporting requirements.  This latter definition of "expenditure" included "purchase[s], payment[s] . . . made for the purpose of (A)

---

[2] All of the statutes relied upon in *Buckley* are available in an appendix to that opinion.  This court's citation to those statutes refers to their appearance in that appendix.

influencing the nomination for election, or the election, of any person to Federal office . . . ." 2 U.S.C. § 431(f)(1).

In time, the *Buckley* requirement of express advocacy came to seen by many as an insufficient response to the swelling chorus of "soft money" advertisements, frequently negative, designed to influence the outcome of elections without explicitly telling anyone how to vote. And, from the opposite perspective, others believed that restrictions on the right of corporations to engage in political speech violated the First Amendment. These contrary impulses towards more or less regulation of political speech have directed legislative and judicial debate since *Buckley*.

In 2002, Congress enacted the Bipartisan Campaign Reform Act, Public L. No. 107-155, 116 Stat. 81 (2002) (amending the Federal Election Campaign Act of 1971 ("FECA")), 2 U.S.C. §§ 431–457 ("BCRA"). BCRA created a new legal category—"electioneering communications"—to regulate "soft money" ads. Any ad run within 60 days of the general election (30 days for primaries and caucuses) which clearly identifies a candidate for federal office and is "targeted to the relevant electorate" is subject to reporting and disclosure requirements. 2 U.S.C. § 434(f)(3)(A)(i)(III).

The *McConnell* decision upheld these reporting and disclosure requirements. In the view of the majority, *Buckley's* "express advocacy" requirement was an exercise in statutory construction necessary to save the specific language of the 1971 version of the FECA from constitutional attack.[3] It was not a general principle of constitutional law applicable to all reporting and disclosure requirements. The new BCRA category of "electioneering communications" included limiting provisions—especially the temporal limits of 60 and 30 days for general and primary elections respectively—which were sufficiently specific and objective to place a political action committee or other group on notice that their expenditure would trigger the requirements.

The *McConnell* decision rejected the *Buckley* bright-line test in sharply critical language.

> Nor are we persuaded, independent of our precedents, that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy. That notion cannot be squared with our longstanding recognition that the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad. Indeed, the unmistakable lesson from the record in this litigation . . . is that *Buckley's* magic-words requirement is functionally meaningless. Not only can advertisers easily evade the line by eschewing the use of magic words, but they would seldom choose to use such words even if permitted. And although the resulting advertisements do not urge the viewer to vote for or against a candidate in so many words, they are no less clearly intended to influence the election. *Buckley's* express advocacy line, in short, has not

---

[3] The specific statutory language found to be unconstitutionally vague in *Buckley* was replaced with the more concrete BCRA standards of (1) a broadcast; (2) identifying a candidate (3) aired within certain time frames; and (4) targeted to an audience of at least 50,000, which cured the "vagueness" problem.

aided the legislative effort to combat real or apparent corruption, and Congress enacted BCRA to correct the flaws it found in the existing system.

*McConnell v. Federal Election Commission*, 540 U.S. 93, 193–94 (2003) (citations omitted).

The challenge to the reporting and disclosure requirements of BCRA was facial, which is to say that it was a challenge to the law in every possible application. The court left open the possibility of an "as applied" challenge by someone alleging discriminatory enforcement or some other harm specific to an individual case.

As the Supreme Court's most recent statement on the subject of disclosure and disclaimer requirements, *Citizens United* carries particular weight. Although the case is best known for largely erasing the distinction between individual and corporate political expenditures, *Citizens United* included an "as applied" challenge to the FEC requirements of registration and disclosure for a non-profit corporation engaged in "electioneering communications" as that term is defined by federal law. The Court reaffirmed the constitutional standard of "exacting scrutiny" of the regulation of electioneering activity. Upon a showing of a substantial relationship between disclosure and a sufficiently important governmental interest, private organizations engaged in electioneering can be required to comply with federal election laws. The Court followed *McConnell* in upholding the law against a facial challenge and noted that any challenge to such laws as unconstitutional "as applied" would require proof of a reasonable probability of threats, harassment, or reprisals against the private organization.

B.  The Vermont provisions

In this case, the State seeks to enforce two provisions of the state election law. These are the registration and reporting requirements for political committees (17 V.S.A. §§ 2811, 2831) and the identification of persons who pay for "electioneering communications" (17 V.S.A. § 2892).

17 V.S.A. § 2831 provides in relevant part:

> (a) Each political committee and each political party which has accepted contributions or made expenditure of $500.00 or more shall register with the secretary of state stating its full name and address, the name of its treasurer; and the name of the bank in which it maintains its campaign checking account within ten days of reaching the $500.00 threshold.

17 V.S.A. § 2811 supplements this provision with an additional requirement of a "campaign finance report" to be filed by political committees subject to section 2831.

Section 2892 provides in relevant part:

8

All electioneering communications shall contain the name and address of the person, political committee, or campaign who or which paid for the communication. The communication shall clearly designate the name of the candidate, party, or political committee by or on whose behalf the same is published or broadcast.

An "electioneering communication" is defined at § 2891 as:

Any communication, including communications published in any newspaper or periodical or broadcast on radio or television or over any public address system, placed on any billboards, outdoor facilities, buttons or printed material . . . that refers to a clearly identified candidate for office and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office, regardless of whether the communication expressly advocates a vote for or against a candidate.

Green Mountain Future contends that the two provisions are unconstitutional on their face because they restrict speech and are too vaguely worded to give fair notice of their import to people and organizations engaged in debate on public issues. It relies upon the distinction in *Buckley* between express advocacy for or against a candidate (registration required) and issue advocacy (registration unconstitutional). Green Mountain Future recognizes that *McConnell* changed the rules and does not contest the state's authority to require registration and disclosure by a properly limited statute. However, Green Mountain Future argues that Vermont's authority is limited to the definition of "electioneering communication" which appears in the 2002 BCRA.[4] Otherwise, argues Green Mountain Future, a statute, such as Vermont's, is unconstitutionally vague and remains subject to *Buckley's* "magic words" construction.

The court rejects the argument that in the absence of legislative language equal in specificity to BCRA, all disclaimer and disclosure requirements remain subject to the *Buckley* requirement. Green Mountain Future's argument fails to recognize either the virtual reversal of the *Buckley* decision on this point by *McConnell* and *Citizens United* or the enhanced specificity of the Vermont statutes.

Following *Buckley*, Congress responded to the "magic words" requirement by amending the federal election law so that it applied within a particular timeframe to any ad that mentions a candidate's name. The new statute was not vague at all but made no attempt to incorporate any more probing distinction between campaign advocacy and issue advocacy than requiring that the ad identify a candidate. See *McConnell*, 540 U.S. at 190 (describing the language of the statute).

The new statute was challenged in *McConnell*. A principal argument raised in *McConnell* was that the magic words requirement was, as *Buckley* at least implied, a

---

[4] Green Mountain Future clarifies in its April 11, 2011 filing that vagueness is its principal issue in this case.

substantive constitutional boundary between campaign advocacy and issue advocacy, and the new statute violated it by failing to clearly draw the same distinction. The *McConnell* majority flatly rejected this argument, expressly distinguishing between vagueness and the substantive constitutional issue. According to the *McConnell* Court, the *Buckley* "magic words" savings construction was a matter of statutory interpretation *only*.[5] The new statute presented no such vagueness problem because, however broad, it was clear as to its reach. As an apparently separate substantive constitutional matter, the *McConnell* Court then explained, the "bright-line" requirements of *Buckley* were insufficient to meet the need for registration and disclosure of the increasing numbers of "soft money" organizations which sought to influence elections. There is no meaningful difference "between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers 'call Jane Doe and tell her what you think.'" *McConnell*, 540 U.S. at 127. As a substantive matter, the *Buckley* savings construction saved nothing. The Court ruled the new statute facially valid, not overbroad. This facial validity clearly indicates that the new statute would be constitutional in most of its applications.

The Court next returned to the matter of disclaimer and disclosure in *Citizens United*. Citizens United essentially tried to bring an as-applied challenge to the disclosure and disclaimer requirements of the federal statute. The Court disagreed in no uncertain terms. "We rejected these arguments in *McConnell* . . . . And we now adhere to that decision *as it pertains to the disclosure provisions*." *Citizens United v. Federal Election Commission*, 130 S.Ct. 876, 915 (2010) (emphasis added). Likening the disclosure provisions to those it has upheld in the lobbying context, the Court rejected "Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." *Id*. Citizens United thus was permitted to argue that disclosure was unconstitutional as applied to it if there was "a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed." *Id*. at 916. Otherwise, its as-applied challenge was foreclosed— the disclaimer and disclosure requirements, even if they extended into issue advocacy, are not overbroad.

Green Mountain Future's attempt to impose a return to the *Buckley* rule (in which the distinction between campaign and issue advocacy is crucial) fails to fully consider the far more important precedents of *McConnell* and *Citizens United* (in which the distinction, in

---

[5] This holding of *McConnell* has been labeled "disingenuous" by one scholar. R. Briffault, McConnell v. FEC *and the Transformation of Campaign Finance Law*, 3 Election L.J. 147, 168 (2004), quoted in Note, *The* McConnell *Corollary: Vague Laws Must Still Toe The* Buckley *Express Advocacy Line*, 1 Seton Hall Circ. Rev. 201 (2005). Professor Briffault currently is the Joseph P. Chamberlain Professor of Legislation at Columbia Law School. See http://www.law.columbia.edu/faculty (last visited Apr. 21, 2011). He was the "coauthor of an amicus brief submitted on behalf of twenty-five House of Representatives members defending the constitutionality of BCRA" in *McConnell*. Note, supra, at 206 n.34. He is hardly the only critic of the Court's campaign finance decisions. Judge Richard Posner, in the wake of *McConnell*, called these decisions "baffling and conflicted." *Majors v. Abell*, 361 F.3d 349, 355 (7th Cir. 2004). Professor Hasen, following *Citizens United*, called them necessarily conflicted but unnecessarily incoherent. See generally R. Hasen, Citizens United *and the Illusion of Coherence*, 109 Mich. L. Rev. 581 (2011).

the disclosure context, matters far less, if at all).[6] Courts typically require greater exactitude in the First Amendment context because vagueness can have a chilling effect. 1 Smolla & Nimmer on Freedom of Speech § 6:15 (WL updated March 2011). *Buckley*, *McConnell*, and *Citizens United* demonstrate that the direct regulation of political speech is nearly completely intolerable to the Court, leading it to apply the vagueness and overbreadth doctrines in the strictest way in that context. With *McConnell* and *Citizens United*, it now should be clear that disclaimer and disclosure requirements are different in kind. They "may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'" *Citizens United*, 130 S.Ct. at 914 (citations omitted). Vagueness is not irrelevant in the disclosure context, but the doctrine should not be applied to require the impossibly perfect exactitude required by *Buckley*.

Green Mountain Future argues that, for purposes of registration, "political committee" is vague and, for purposes of disclaimer and disclosure, "electioneering communications" is vague. "Political committee" is defined as:

> any formal or informal committee of two or more individuals, or a corporation, labor organization, public interest group, or other entity, not including a political party, which receives contributions of more than $500.00 and makes expenditures of more than $500.00 in any one calendar year *for the purpose of supporting or opposing one or more candidates, influencing an election, or advocating a position on a public question in any election or affecting the outcome of an election.*

17 V.S.A. § 2801(4) (emphasis added). An "electioneering communication" is:

> any communication, including communications published in any newspaper or periodical or broadcast on radio or television or over any public address system, placed on any billboards, outdoor facilities, buttons or printed material attached to motor vehicles, window displays, posters, cards, pamphlets, leaflets, flyers, or other circulars, or in any direct mailing, robotic phone calls, or mass e-mails *that refers to a clearly identified candidate for office and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office, regardless of whether the communication expressly advocates a vote for or against a candidate.*

17 V.S.A. § 2891 (emphasis added).

Green Mountain Future's argument, and the key problem with it, are evident in this paragraph of its supporting memorandum:

---

[6] Green Mountain Future's attempt to rely on *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 386 (2d Cir. 2000), is similarly misplaced. That case predates *McConnell* by 3 years and *Citizens United* by 10. It relies on *Buckley* and does not anticipate the subsequent development of the law.

The *McConnell* Court simply established that Congress and state legislatures may regulate political speech beyond express advocacy but only if the state enacts a statute like [the] BCRA definition of "electioneering communication" that is both easily understood and objectively determinable. If the statutory language used to regulate speech is vague then the *Buckley* bright-line standard between express advocacy and issue advocacy must be applied to ensure that political speech protected by the First Amendment is not regulated by the state.

Green Mountain Future's memo at 15 (filed Feb. 15, 2011). First, *McConnell* and *Citizens United* do not require disclosure provisions under state law to be identical to those of BCRA. These cases construe federal election law, not state provisions. More importantly, as the analysis of the case law above demonstrates, any vagueness problem with the Vermont statutes, following *McConnell* and *Citizens United*, does not require a return to the *Buckley* magic-words savings construction. *Buckley* limited the statute at issue there to expressly stated advocacy because the Court perceived the need to draw a bright-line distinction between issue advocacy and campaign advocacy in both the expenditure context *and* the disclosure context. *McConnell* and *Citizens United* did away with that "rigid barrier" in the disclosure context, rendering *Buckley's* magic-words construction inconsistent with contemporary disclosure provisions. Thus, if the Vermont statutes were found to be vague, they presumably could be "saved" with a construction that cures the vagueness based on current law, not the law the U.S. Supreme Court has already abandoned.

In any event, the court finds neither term of the Vermont statutes to be vague. The registration requirements are triggered if a political committee receives in contributions and spends within a calendar year more than $500 "for the purpose of supporting or opposing one or more candidates, influencing an election, or advocating a position . . . affecting the outcome of an election."[7] The court interprets the alternative statutory formulations of the purpose of the expenditure to be the equivalent of "supporting or opposing one or more candidates." The reference to candidates, which is defined with specificity at 17 V.S.A. § 2801(1), ensures that this provision necessarily applies in the election context only; "election" also is defined with specificity and is incorporated into the definition of "candidate." 17 V.S.A. § 2801(7). It also ensures that if the ad cannot reasonably be viewed as referring to a candidate, the registration requirements are not triggered. As this case demonstrates, ads, the expenditures principally at issue in this case, that support or oppose a candidate in an election context, viewed in a reasonable, objective manner, are not at all difficult to discern. The definition also contains a fixed time limit: the calendar year. That one might invent an example of an expenditure that presents a close case—none has been suggested in the parties' filings—is insufficient to render the statute vague.

---

[7] The "public question" portion of the definition does not apply to this case. It specifically refers to "an issue that is before the voters for a binding decision." 17 V.S.A. § 2801(8). It is not an amorphous reference to any issue that might be on voters' or candidates' minds.

12

The disclosure provisions apply to a communication that "refers to a clearly identified candidate for office and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office, regardless of whether the communication expressly advocates a vote for or against a candidate." This portion of the definition of "electioneering communications" differs little in effect from the corresponding portion of the definition of "political committee." It requires that the ad identify a candidate, support or oppose that candidate, and is necessarily time-limited. The time limit is inherent in the reference to "candidate." A candidate only exists under the statute if one of the objectively verifiable criteria of § 2801(1) is satisfied. Any ad preceding a period in which there is a "candidate" will not trigger these disclosure provisions.

Green Mountain Future's assertions that its ads were solely related to nuclear policy matters and had nothing to do with Mr. Dubie's candidacy, and that citizens are unable to reasonably understand what expenditures fall under these provisions are unreasonable. Their *only* plausibility is constructed out of a legal rationalization in *Buckley* that the U.S. Supreme Court completely dismantled in *McConnell* and *Citizens United*. Ordinary citizens can understand what speech falls within these statutes. Anyone reviewing the scripts of the Green Mountain Future's two advertisements can only conclude that they attack or oppose Lt. Governor Dubie.

As the U.S. Supreme Court said in *McConnell*, "The words 'promote,' 'oppose,' 'attack,' and 'support' clearly set forth the confines within which potential . . . speakers must act in order to avoid triggering the provision. These words 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *McConnell*, 540 U.S. at 170 n. 64 (citation omitted). Such words are not vague.

Although Green Mountain Future identifies cases striking down restrictions on content, timing, contributions, and expenditures, with only one exception, no case it cites strikes down mere registration or disclosure requirements. Four years before *Citizens United*, the Fifth Circuit "saved" a Louisiana campaign disclosure provision with a *Buckley* magic words construction. *Center for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006). The majority ruled that the "supporting, opposing, or otherwise influencing" language of the statute suffered from the same vagueness as the language in *Buckley*, *McConnell* did not change the rules once a statute is determined to be vague, and that a *Buckley* savings construction thus was required. The *Carmouche* decision is not persuasive. The majority's determination of vagueness presumed the ongoing utility of the bright-line distinction of *Buckley* and did not fully consider the effect of *McConnell*. As the dissent in *Carmouche* pointed out, even if there was a vagueness issue in the statute, *McConnell* clearly indicates that a savings construction no longer needs to take the form of the one in *Buckley*.

There are other Vermont election law requirements such as a cap on expenditures by political committees which raise important constitutional issues. See *Randall v. Sorrell*, 548 U.S. 230 (2006). In this case, the state does not seek to enforce any provisions beyond registration and disclosure. Despite filing a counterclaim, Green Mountain

13

Future does not seek any relief beyond striking down the registration and disclosure provisions. The issue of limiting expenditures is not before the court.

### C. "As applied"

The claim that the registration and disclosure provisions may be constitutional in the abstract but are unconstitutional *as applied* in this case requires proof of discrimination or anticipated retribution. *Citizens United v. Federal Election Commission*, 130 S.Ct. 876, 914–15 (2010). Green Mountain Future offers no evidence that it has been singled out for enforcement, that enforcement is politically motivated, or that disclosure would lead to retribution. Green Mountain Future's challenge is to the election law in general, not to its application in this particular case.

The court answers its second and third questions in the negative. The court rejects the claim that the registration and disclosure requirements are unconstitutional, either facially or "as applied."

### ORDER

For these reasons, the state's motion for summary judgment with respect to liability is granted; Green Mountain Future's motion for summary judgment is denied. The court will set a hearing on the scope of declaratory relief, civil penalties, and all other issues related to the damages portion of the case.

Dated at Montpelier, Vermont this _____ day of June 2011.

_____
Geoffrey W. Crawford, Presiding Judge