# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 20, 2015          Decided January 21, 2016

No. 15-5016

CHRISTOPHER VAN HOLLEN, JR.,
APPELLEE

v.

FEDERAL ELECTION COMMISSION,
APPELLEES

CENTER FOR INDIVIDUAL FREEDOM AND HISPANIC
LEADERSHIP FUND,
INTERVENOR-APPELLANTS

———

Consolidated with 15-5017

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:11-cv-00766)

———

*Thomas W. Kirby* argued the cause for appellant Center for Individual Freedom. With him on the briefs were *Jan Witold Baran*, *Caleb P. Burns*, and *Samuel B. Gedge.*

*Jason Torchinsky* was on the brief for appellant Hispanic Leadership Fund.

*Daniel Z. Epstein* and *Joshua N. Schopf* were on the brief for *amicus curiae* Cause of Action in support of appellants.

*Catherine M.A. Carroll* argued the cause for appellee Christopher Van Hollen Jr.  With her on the brief were *Roger M. Witten*, *Donald J. Simon*, *Trevor Potter*, *J. Gerald Hebert*, *Fred Wertheimer*, and *Scott L. Nelson*.

*Kevin A. Deeley*, Acting Associate General Counsel, *Harry J. Summers*, Assistant General Counsel,  *Holly J. Baker* and *Seth E. Nesin*, Attorneys, Federal Election Commission, were on the brief for appellee Federal Election Commission.

Before: BROWN, *Circuit Judge*, SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The arc of campaign finance law has been ambivalent, bending toward speech and disclosure. Indeed what has made this area of election law so challenging is that these two values exist in unmistakable tension. Disclosure chills speech. Speech without disclosure risks corruption. And the Supreme Court's track record of expanding who may speak while simultaneously blessing robust disclosure rules has set these two values on an ineluctable collision course.

That tension is on full display in this appeal. At issue is whether to uphold the FEC's rule requiring corporations and labor organizations to disclose only those donations "made for the purpose of furthering electioneering communications" or whether the Bipartisan Campaign Reform Act requires disclosure of *all* donations irrespective of donative purpose.

Christopher Van Hollen, Jr.—a member of the United States House of Representatives—challenged this rule under the familiar *Chevron* and *State Farm* frameworks. In a previous judgment, we reversed the district court and held the rule survived *Chevron* Step One. We now consider whether the rule survives Step Two and *State Farm*'s "arbitrary and capricious" test. We hold that it does.

I

Congressman Van Hollen's challenge to the FEC's disclosure rules is best understood in its broader context, the century-long conflict over campaign finance reform. That context is a protean cascade of perspectives, supplied by each branch of government, on how best to safeguard democracy without unnecessarily sacrificing liberty.

Throughout the twentieth and early twenty-first centuries, campaign finance reform efforts endeavored both to ban corporate contributions and to expand disclosure requirements. These efforts date as far back as President Theodore Roosevelt's State of the Union address in 1905. Nine years earlier, William McKinley defeated populist William Jennings Bryan with a war chest of $16 million, dwarfing Bryan's paltry $600,000. Public opinion steadily galvanized in favor of campaign finance reform, prompting Roosevelt to champion the cause. Roosevelt urged Congress to forbid "[a]ll contributions by corporations . . . for any political purpose" and to "secure by law the full and verified publication in detail of all [political contributions]." President Theodore Roosevelt, State of the Union Address (Dec. 5, 1905), *available at* http://www.presidency.ucsb.edu/ws/index.php?pid=29546. Two years later, Congress heeded his call with the Tillman Act of 1907. *See* Ch. 420, 34 Stat. 864.

The Tillman Act was just the beginning. Over the ensuing decades, Congress passed, in piecemeal fashion, several reform measures. The Federal Corrupt Practices Act, the Hatch Act, the Smith-Connolly Act of 1943, and the Taft-Hartley Act of 1947 each contained provisions aimed at tackling political corruption in campaign finance, either through restricting speech or requiring disclosure. And in 1974, Congress completed a massive campaign finance overhaul with passage of the Federal Election Campaign Act (FECA).

FECA confronted headlong the "who" and "how much" of campaign contributions. The Act established caps on contributions and expenditures, restricted corporations and unions from making independent expenditures, and required that the identities of any individuals making a contribution or expenditure be disclosed to the newly created Federal Elections Commission. The Supreme Court blessed most of FECA's reforms in *Buckley v. Valeo*, 424 U.S. 1 (1976), striking only the caps on individual, candidate, and campaign expenditures. But critically, while upholding FECA's disclosure requirements, the Court construed them narrowly to reach only "contributions earmarked for political purposes" and "expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80.

The Court's gloss on FECA's disclosure requirements turned out to be a pyrrhic victory for campaign finance reformers. The "express advocacy" carve-out opened a gaping new loophole: advertising expenditures that eschewed magic words like "elect Mary Smith" or "defeat John Brown" could now go undisclosed. Corporations, unions, and political parties took full advantage by sponsoring "issue ads," which

were functionally equivalent to express advocacy but comfortably skirted FECA's disclosure requirements.

Determined to close this loop, Congress passed the Bipartisan Campaign Reform Act (BCRA) in 2002. BCRA recognized and regulated a new category of political advertising called "electioneering communications," defined as communications that "refer[] to a clearly identified candidate" "made within" sixty days of a general election or thirty days of a primary election. 2 U.S.C. § 434(f)(3)(A)(i) (2002). These communications were precisely the sort left unregulated by *Buckley*'s construction of FECA, and BCRA now subjected them to robust disclosure requirements. It required any person making an expenditure (referred to as a "disbursement") totaling more than $10,000 to disclose "all persons sharing the costs of the disbursement." *Id.* §§ 434(f)(2)(A), (B), and (D). BCRA also went one step further: it altogether banned corporations and unions from using their general treasuries to fund electioneering communications. *Id.* § 441b(b)(2). These provisions were upheld by a sharply divided Court in *McConnell v. FEC*, 540 U.S. 93 (2003).

In BCRA's wake, the FEC promulgated several rules to enforce the various reforms, two of which are relevant to today's appeal. First, the FEC promulgated a rule enforcing BCRA's ban on corporate and union expenditures for electioneering communications. Electioneering Communications, 67 Fed. Reg. 65190, 65190 (Oct. 23, 2002). Second, the FEC promulgated a rule to enforce BCRA's requirement for disclosure of "the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement." 52 U.S.C. 434(f)(2)(E)–(F). The FEC's rule mirrored this language almost identically but replaced the words "contributor" and "contributed" with "donor" and "donated." Bipartisan

Campaign Reform Act of 2002 Reporting, 68 Fed. Reg. 404, 420 (Jan. 3, 2003). Whatever the import of that choice, it is clear that as of 2003, (1) corporations and unions could not fund electioneering communications out of their general treasuries, and (2) with certain exceptions not relevant to this opinion, persons making disbursements for electioneering communications had to disclose the names of *anyone* who donated $1,000 or more to them.

But the Supreme Court would soon deliver a heavy blow to BCRA's attempt to regulate electioneering communications. With its ruling in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), another sharply divided decision, and this time without even a majority opinion, the Court held corporations and unions could not be barred from electioneering communications unless they are "the functional equivalent of express advocacy." *Id.* at 465. And an ad is only the functional equivalent of express advocacy, the Court said, when it "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469–70. The three ads before the Court in *Wisconsin Right to Life* couldn't satisfy this exacting test, and neither, it seems, could the vast majority of issue ads funded through independent expenditures. *See Id.* at 476. For restrictions on core political speech, the Court announced it would "give the benefit of the doubt to speech, not censorship." *Id.* at 482. BCRA's prohibition on corporate- and union-funded electioneering communications, beaten and tattered by *Wisconsin Right to Life*, was left on life support.[1]

---

[1] The Court's subsequent decision in *Citizens United v. FEC* pulled the plug on this ban once and for all, ruling unconstitutional the prohibition on corporate- and union-funded "express advocacy." 558 U.S. 310, 365 (2010).

The FEC was now left to decide how BCRA's disclosure requirements should apply to a class of speakers Congress never expected would have anything to disclose. The FEC published a Notice of Proposed Rulemaking (NPRM) and requested comments on proposed rules that "would implement the Supreme Court's decision in *Wisconsin Right to Life*." 72 Fed. Reg. 50261, 50262 (Aug. 31, 2007). That NPRM advanced two proposals for applying BCRA's disclosure provisions to corporations and unions. Under the first, the FEC would simply apply the existing disclosure requirements for individuals and qualified nonprofit corporations (QNCs) to corporations and unions, which would require disclosure of *all* $1,000 contributors. *Id.* Under the second, the FEC proposed to exempt corporations and unions from the disclosure requirements altogether. *Id.*

The FEC received twenty-seven comments and held a two-day hearing. Rather than embracing either of the NPRM's proposals, it adopted a middle path. *See* Electioneering Communications, 72 Fed. Reg. 72899, 72900 (Dec. 26, 2007). Corporations and unions would not be altogether exempted, but neither would they be required to disclose every donation totaling $1,000 or more. *Id.* Rather, corporations and unions would be required to disclose all donations totaling $1,000 or more that were "made for the purpose of furthering electioneering communications." *Id.* at 72911. This new "purpose requirement" set corporate and union electioneering communications apart from communications funded by other persons, who were still required to disclose all donations regardless of purpose.

Representative Christopher Van Hollen challenged the FEC's new purpose requirement and persuaded the district court that it violated BCRA's text. *Van Hollen v. FEC*, 851 F.Supp.2d 69 (D.D.C. 2012); *see Chevron, USA, Inc. v. Nat.*

*Res. Def. Council, Inc.*, 467 U.S. 837 (1984). That decision was appealed to and reversed by a panel of this court, which concluded BCRA's disclosure provisions were ambiguous, and the FEC's rule cleared Chevron Step One. *Ctr. for Individual Freedom v. Van Hollen*, 694 F.3d 108, 111 (D.C. Cir. 2012). Congress's use of the terms "contributors" and "contributed," the panel said, is "anything but clear." *Id.* The panel did "not agree with the District Court that the[se] words . . . cannot be construed to include a 'purpose' requirement." *Id.* However, it concluded that it was "in no position to assess the parties' arguments on whether § 104.20(c)(9) is reasonable, and thus entitled to deference under *Chevron* Step Two, or whether the regulation survives arbitrary and capricious review." *Id.* at 112. The panel sent the case back to the district court to sort these questions out.[2]

On remand, the district court concluded that the FEC's rule failed at both the *Chevron* Step Two and arbitrary and capricious stages. The Center for Individual Freedom filed its notice of appeal shortly thereafter.[3] We review the FEC's action de novo, according no particular deference to the

---

[2] Technically, the panel instructed that the matter be referred back to the FEC in order to give it a chance to revisit and clarify its rule. *Ctr. for Individual Freedom*, 694 F.3d at 112. But when the FEC declined to comment further, Van Hollen's challenge in district court resumed.

[3] Our previous ruling affirmed the Center for Individual Freedom's and the Hispanic Leadership Fund's standing to appeal the district court's judgment. *Ctr. for Individual Freedom*, 694 F.3d at 110 ("We are satisfied that the Intervenors have standing to pursue this appeal, for they have convincingly demonstrated that the District Court's decision . . . has caused them injury that will be redressed by a favorable decision from this court."). As the posture of this appeal is identical to the previous, we have neither the occasion nor inclination to reconsider our prior determination.

district court's judgment. *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2012).

## II

Our analysis of Van Hollen's challenge picks up where our prior judgment left off. Van Hollen argues the FEC's disclosure rule is both an impermissible construction of BCRA and an arbitrary and capricious use of the FEC's regulatory authority, and the district court agreed on both scores. For the reasons outlined below, we do not.

## A

We are first asked to decide whether the FEC's purpose requirement is "based on a permissible construction of [BCRA] in light of its language, structure, and purpose." *Nat'l Treasury Emp. Union v. FLRA*, 754 F.3d 1031, 1042 (D.C. Cir. 2014). This inquiry, often called *Chevron* Step Two, "does not require the best interpretation, only a reasonable one." *Am. Forest and Paper Ass'n v. FERC*, 550 F.3d 1179, 1183 (D.C. Cir. 2008). "We are bound to uphold agency interpretations . . . regardless whether there may be other reasonable, or even more reasonable, views." *Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 296 (D.C. Cir. 2013). In this case, BCRA is ambiguous, and the FEC's construction of it is reasonable. We defer accordingly.

The starting place for any *Chevron* Step Two inquiry is the text of the statute. BCRA states, in relevant part:

> "Every person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any

> calendar year shall . . . file with the Commission a statement containing . . . the names and addresses of *all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement.*"

52 U.S.C. § 30104(f) (emphasis added). This provision directs the disclosure of "all contributors" and omits any explicit mention of a purpose requirement. By contrast, the neighboring section governing express advocacy directs disclosure of "each person who made a contribution . . . for the purpose of furthering an independent expenditure." *Id.* § 30104(c)(2)(C). The nonparallel nature of these two related provisions, Van Hollen contends, renders impermissible the FEC's purpose requirement. At the same time, FECA elsewhere defines "contribution," a term derived from the same root as the words in the challenged section, as a donation "by any person *for the purpose of influencing any election for Federal office*." 52 U.S.C. § 30101(8)(A)(i) (emphasis added). And the FEC intentionally drew upon the express advocacy purpose requirement as precedent for resolving the ambiguity in the electioneering communications provision. *See* 72 Fed. Reg. at 72911 n.22. Our question, then, is this: Does BCRA's text permit the FEC's purpose requirement?

To answer this, we must first remember what we've already settled. In our previous ruling, we concluded Congress did not have "an intention on the precise question" whether a purpose requirement is permissible as "it is doubtful that . . . Congress even anticipated the circumstances that the FEC faced when it promulgated [this regulation]." *Ctr. for Individual Freedom*, 694 F.3d at 111. We noted "it was due to the complicated situation that confronted the agency in 2007 and the absence of plain meaning in the

statute that the FEC acted . . . to fill 'a gap' in the statute." *Id.* But while we might have stopped there, our analysis went beyond merely highlighting BCRA's ambiguity. We also weighed in on the precise interpretive question relevant to Step Two. We disagreed with the district court "that the words 'contributors' and 'contributed' . . . cannot be construed to include a 'purpose' requirement" and cited multiple dictionaries that "define 'contribute' in a way that is consistent with the regulation." *Id.* at 110–11. In other words, we held that whether corporations and unions should be required to disclose every person who gave $1,000 or more or only those who gave for the purpose of influencing electioneering communications was an open policy question, one Congress left for the FEC to decide.

That decision largely foreordains our *Chevron* Step Two answer. In deciding the Step One question, we did not limit our analysis to whether BCRA is ambiguous; we specifically concluded the FEC's interpretation of "contributors" was within the range of linguistically permissible constructions. Having thus already concluded section 30104(f) *could* be construed to include a purpose requirement, it would be odd for us to reverse course now and declare it *could not*.

But even setting aside that we all but answered the Step Two question last time around, the FEC's purpose requirement is more than just a permissible construction of BCRA; it's a persuasive one. For one, as suggested above, the FEC's purpose requirement is consistent with the purpose-laden definition of "contribution" set forth in FECA's very own definitional section. *See* 52 U.S.C. § 30101(8)(A)(i) (defining "contribution" as "anything of value made . . . for the purpose of influencing [a federal] election")*.* "

Moreover, the FEC's purpose requirement regulates electioneering communication disclosures in precisely the same way BCRA itself regulates express advocacy disclosures. In a neighboring provision, BCRA requires a person making an express advocacy expenditure to disclose only those "person[s] who made a contribution . . . for the purpose of furthering an independent expenditure." *Id.* § 30104(c)(2)(C). Thus, to resolve the ambiguity it faced in *Wisconsin Right to Life*'s wake, the FEC simply opted for an approach already endorsed by Congress in a related context. That "Congress codified the very approach" the FEC now adopts in a similar context is "highly persuasive in demonstrating" the FEC's construction of BCRA "does not reflect an unreasonable interpretation of the statute." *Public Citizen v. Carlin*, 184 F.3d 900, 906 (D.C. Cir. 1999).

Van Hollen counters this point, arguing Congress's failure to include a purpose requirement in the electioneering communication context—which it included for express advocacy— textually precludes the FEC from later doing so. This is a classic invocation of the *expressio unius* canon of construction, and if we were interpreting this statute directly rather than filtered through an agency's construction, Van Hollen's argument would have serious bite. However, as is usually the case, the procedural posture matters. The *expressio unius* canon operates differently in our review of agency action than it does when we are directly interpreting a statute. *See Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) ("[T]his canon has little force in the administrative setting."); *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990) ("Whatever [*expressio unius*'s] general force, we think it an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved."). In scenarios of precisely this ilk, "we

13

have consistently recognized that a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion." *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009). This approach dovetails appropriately with the wide latitude we afford agencies when interpreting statutes: we do not demand the *best* interpretation, only a reasonable one.

Nor do Van Hollen's other arguments persuade us that the FEC's purpose requirement was an impermissible construction of BCRA. Van Hollen contends the requirement "frustrate[s] the policy that Congress sought to implement" and therefore must be rejected. *See Shays v. FEC*, 528 F.3d 914, 919 (D.C. Cir. 2008). Specifically, he asserts the FEC's rule violates BCRA's primary purpose of "improv[ing] disclosure" and "curtail[ing] circumvention of campaign finance rules," allowing contributors to "avoid reporting altogether" by simply "transmitting funds but remaining silent about their intended use." Van Hollen Br. at 27–28. And here, his invocation of our *Shays* decision does lend a measure of credibility. A panel of this court invalidated a regulation allowing "candidates to evade—almost completely—BCRA's restrictions on the use of soft money" because it "frustrate[d] Congress's goal of prohibiting soft money" in federal elections. 528 F.3d at 925. According to Van Hollen (and the district court), since "the legislative history of the BCRA makes it clear that the purpose behind the disclosure requirements was to enable voters to be informed about who was trying to influence their decisions," the purpose requirement's "limiting language" similarly frustrates BCRA. *Van Hollen*, 74 F.Supp.3d at 433–34.

But the art of statutory construction has moved beyond

this particularly results-oriented brand of purposivism. Just because *one* of BCRA's purposes (even *chief* purposes) was broader disclosure does not mean that anything less than maximal disclosure is subversive.[4] Statutes are hardly, if ever, singular in purpose. Rather, most laws seek to achieve a variety of ends in a way that reflects the give-and-take of the legislative process. *See Patel v. USCIS*, 732 F.3d 633, 636 (6th Cir. 2013) ("[I]t is folly to talk about 'the purpose' of the statute when the statute reflects a compromise between multiple purposes."). That BCRA seeks more robust disclosure does not mean Congress wasn't also concerned with, say, the conflicting privacy interests that hang in the balance. In fact, Congress "took great care in crafting . . . language to avoid violating the important p[]rinciples in the First Amendment." 147 CONG. REC. S3033 (daily ed. Mar. 28, 2001) (statement of Sen. Jeffords). *Chevron* demands our deference when an agency's interpretation is "a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." 467 U.S. at 845.

Moreover, the district court's invocation of such a sweeping disclosure purpose contradicts the very statute whose purposes it purports to protect. BCRA does *not* require disclosure at all costs; it *limits* disclosure in a number of

---

[4] At oral argument, Van Hollen's counsel conceded that BCRA did not call for unbounded disclosure. The district court, however, was less sanguine, suggesting unbounded disclosure was BCRA's aim:

> [I]t was contrary to the policy goal that Congress intended to implement for the Commission to add limiting language to its regulations when the aim of that language was—as the FEC put it—'to ensure that disclosure of the newly-permitted electioneering communications would be narrowly tailored.' Congress did not call for narrow tailoring; it called for just the opposite.

*Van Hollen*, 74 F.Supp.3d at 434.

ways. For example, for electioneering communications under $10,000, no disclosures are necessary, *see* 52 U.S.C. § 30104(f)(1), and for those over $10,000, BCRA does not require disclosure of those who contribute $999 or less, *see id.* § 30104(f)(2)(E). These disclosure limitations suggest Congress's purposes were far more nuanced than the district court's characterization concedes.

To be sure, a statute's purpose is *relevant* to *Chevron*'s Step Two inquiry. *See UC Health v. NLRB*, 803 F.3d 669, 675 (D.C. Cir. 2015) (requiring deference so long as an agency construction is "reasonable and consistent with the statute's purpose"). But we are judges, not legislators, and it behooves us to maintain a healthy sense of modesty regarding our ability to discern the scope and priority of purposes the BCRA Congress pursued. "What judges believe Congress 'meant' (apart from the text) has a disturbing but entirely unsurprising tendency to be whatever judges think Congress *must* have meant, i.e., *should* have meant." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 117 (2007) (Scalia, J., dissenting). What matters here is that Congress left the meaning of "contributor" ambiguous. Congressional silence of this sort is, in *Chevron* terms, "an implicit delegation from Congress *to the agency* to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (emphasis added). It is a transfer of authority to the FEC, whose task it then became "not to find the best meaning of the text, but to formulate legally binding rules to fill in gaps based on policy judgments made *by the agency rather than Congress*." *Michigan v. EPA*, 135 S. Ct. 2699, 2713 (2015) (Thomas, J., concurring) (emphasis added). The FEC did precisely that, deciding to fill the gap left in BCRA with the same purpose-requirement Congress adopted in related contexts. We are loathe to upset such a policy

judgment based on nothing more than highly generalized overtures to BCRA's "primary purpose."

Because the FEC's purpose requirement is consistent with BCRA's text, history, and purposes, it easily clears the *Chevron* Step Two hurdle.

B

We are next asked to decide whether the FEC's purpose requirement is "arbitrary and capricious." The Administrative Procedure Act deems unlawful any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2), but to invalidate a regulation under *State Farm* review, *see Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), a challenger must show the agency action is not a product of reasoned decisionmaking, *see Fox*, 684 F.3d at 74–75. This is "a heavy burden," since *State Farm* entails a "very deferential scope of review" that forbids a court from "substitut[ing] its judgment for that of the agency." *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C. Cir. 2000). The APA's arbitrary and capricious standard requires, *inter alia,* that an agency adequately explain its action so that a reviewing court can "evaluate the agency's rationale at the time of decision." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990).

This appeal presents two *State Farm* challenges. First, the district court held the FEC acted unreasonably in revisiting its original 2003 rule, concluding the FEC's subsequent action was unnecessary because the Supreme Court's *Wisconsin Right to Life* decision left existing disclosure provisions "untouched." *Van Hollen*, 74 F.Supp.3d at 419. Second, Van

Hollen contends the FEC failed to adequately explain its decision to adopt the purpose requirement.

1

The district court held "it was unreasonable for the FEC to alter the statutory reporting requirements on the stated grounds that it was implementing the Supreme Court's decision in [*Wisconsin Right to Life*]" as "nothing" in that decision "required narrowing the disclosure requirements." *Van Hollen*, 74 F. Supp. 3d at 419.[5]

But in focusing on the opinion's silence regarding disclosure, *id.* at 418–19, the district court downplays *Wisconsin Right to Life*'s disruptive import. Before 2007, the *modus operandi* of campaign finance law had always been that Congress could restrict corporate and union speech in the interest of deterring "corruption" or "the appearance of corruption." *See Buckley*, 424 U.S. at 26. But *Wisconsin Right to Life* marked the first chink in that conventional wisdom's armor, an onslaught that would ultimately culminate in the most expansive, speech-protective campaign finance decision in American history, *Citizens United.* After *Wisconsin Right to Life*, corporations and unions suddenly could expend general treasury funds for issue ads, a result Congress had explicitly prohibited under BCRA. An entirely new class of

---

[5] The court apparently proceeds under *Chevron* Step Two, but curiously concludes "[t]he starting point of the second step of the *Chevron* analysis must be the stated reason behind the regulation," and attempts to assess the *adequacy* of that explanation. *See Van Hollen*, 74 F. Supp. 3d at 415. This seems more like *State Farm* than *Chevron*. So, while the district court speaks of the FEC's "unreasonable" action, we think it more appropriate to consider whether its decision to revisit its previous regulation was "arbitrary."

previously silenced speakers was now subject to BCRA's disclosure requirements. And just as the FEC was authorized to decide how to implement BCRA's disclosure provisions for qualified speakers in 2003, it was authorized to decide how to implement BCRA's disclosure provisions for these newly qualified speakers in 2007, too.

It is true *Wisconsin Right to Life* "said absolutely nothing" about the challenged disclosure provisions, but that does not mean the FEC was barred from promulgating a new regulation. An agency "must consider varying interpretations and the wisdom of its policy on a continuing basis . . . in response to changed factual circumstances." *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). The Supreme Court's decision brought an entirely new class of speakers within reach of BCRA's disclosure requirements, a class altogether different from those already subjected to them. Constitutional decisions of this magnitude unquestionably justify an agency in updating its existing regulations to appropriately compensate for changed circumstances.

2

Van Hollen also argues, and the district court agreed, that the FEC failed to adequately explain its decision to adopt the purpose requirement. While an agency is required to adequately explain its decision, this does not mean that its explanation "must be a model of analytical precision." *Dickson v. Sec. of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). It is enough that a reviewing court can reasonably discern the agency's analytical path. *Bowman Transp. Inc. v. Ark.-Best Freight Sys. Inc.*, 419 U.S. 281, 286 (1974). That low hurdle is cleared where the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for

its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

Here, we acknowledge the FEC's explanation was *not* one of "ideal clarity," but, again, ideal clarity is not the standard. The FEC advanced three explanations for its purpose requirement, which we refer to as the "support," "burden," and "privacy" rationales. 72 Fed. Reg. at 72901, 72911. Because we can reasonably discern the FEC's analytical path from these three rationales, we uphold its purpose requirement against Van Hollen's challenge.

## 1. The Support Rationale

The FEC was concerned that some individuals who contribute to a union or corporation's general treasury may not support that entity's electioneering communications, and a robust disclosure rule would thus mislead voters as to who really supports the communications. The agency explained,

> A corporation's general treasury funds are often largely comprised of funds *received from investors such as shareholders* who have acquired stock in the corporation and *customers who have purchased the corporation's products or services*, or in the case of a *non-profit corporation, donations from persons who support the corporation's mission. These investors, customers, and donors do not necessarily support the corporation's electioneering communications.* Likewise, the general treasury funds of labor organizations and incorporated membership organizations are *composed of member dues obtained from individuals and other members who may not*

> *necessarily support the organization's electioneering communications.*

72 Fed. Reg. at 72911 (emphases added). It's hard to escape the intuitive logic behind this rationale. Imagine the following not unlikely scenario. A Republican donates $5,000 to the American Cancer Society (ACS), eager to fund the ongoing search for a cure. Meanwhile, Republicans in Congress, aware of a growth in private donations to ACS, push for fewer federal grants to scientists studying cancer in order to reduce the deficit. In response to their push, the ACS runs targeted advertisements against those Republicans, leading to the defeat of several candidates in the upcoming election. Wouldn't a rule requiring disclosure of ACS's Republican donor, who did *not* support issue ads against her own party, convey some misinformation to the public about who *supported* the advertisements?

Granted, as Van Hollen is quick to point out, the FEC's assertions here were not corroborated with any hard evidence showing contributors who disagree with their chosen corporation's electioneering communications. But these assertions "are, at the very least, speculation based firmly in common sense and economic reality." *Verizon v. FCC.*, 740 F.3d 623, 646 (D.C. Cir. 2014); *see also San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 44 (D.C. Cir. 1986) ("[T]he Commission is not required to hold a hearing to prove what common sense shows."). Here, the FEC's assertion that some number of a corporation's investors, a nonprofit's donors, or a union's members may generally support the entity but not its electioneering communications seems fairly intuitive, at least enough to pass *State Farm*'s "very deferential scope of review." *Transmission Access*, 225 F.3d at 714.

2. The Burden Rationale

This second rationale displayed the FEC's concern not for the interests of contributors or the public, but with the onus placed on the disclosing entity to curate an exhaustive list of every individual who provided more than $1,000. The FEC explained,

> Furthermore, witnesses at the Commission's hearing testified that the effort necessary to identify those persons who provided funds totaling $1,000 or more to a corporation or labor organization would be very costly and require an inordinate amount of effort. Indeed, one witness noted that labor organizations would have to disclose more persons to the Commission under the ECs rules than they would disclose to the Department of Labor under the Labor Management Report and Disclosure Act.

72 Fed. Reg. at 72911. As further support for its explanation, the FEC noted that "all commenters who addressed disclosure of electioneering communications stated that corporations and labor organizations should not be required to report the sources of funds that made up their general treasury funds." *Id.* And one commenter urged an exemption for nonprofits, stating that "nonprofit corporations have a wide variety of sources of income, and unlimited disclosure would create a heavy burden for them." *Id.*

Van Hollen suggests this explanation is inadequate for a couple of reasons. First, he argues the FEC did not support its assertion that identifying contributors would be "very costly and require an inordinate amount of effort" with anything more than "conclusory assertions." Van Hollen Br. at 39. But

this isn't entirely accurate. The Commission cited to one commenter who testified "that labor organizations would have to disclose more persons to the Commission under the [electioneering communications] rules than they would disclose to the Department of Labor," and another commenter who testified that the "reporting requirements would far exceed all other reporting requirements that currently apply to nonprofit organizations, such as reporting to the Internal Revenue Service." 72 Fed. Reg. at 72911. These assertions, relied upon by the FEC, are uncontradicted in the record, and "[w]ithout any contrary evidence to disprove these findings," Van Hollen has "not shown any arbitrary and capricious action." *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013).

Second, Van Hollen suggests the FEC could have mitigated the cost of compliance by clarifying that business income (such as from customers or shareholders) and union dues do not entail "truly donative acts" and are therefore exempt from disclosure. Van Hollen Br. at 43. He points out that the FEC took a similar approach in promulgating the 2003 version of the disclosure rules, clarifying that "individuals are required to disclose donations received, which does not include salary, wages, or other compensation for employment." 68 Fed. Reg. at 414. By exempting these sources of revenue, which are less relevant to voters anyway, the overall compliance costs of the regulation would drop. But this alternative would only reduce the disclosure burdens borne by for-profit corporations and unions. Nonprofit corporations, which, as we've already noted, faced reporting requirements that "would far exceed all other reporting requirements that currently apply to nonprofit[s]," obtain no benefit from this alternative, and the FEC was justifiably concerned about their compliance costs, too. Accordingly, this was not a viable alternative. Since agencies are only required

to consider "significant and *viable*" alternatives, *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (emphasis added), we find no error in the FEC's decision not to adopt this only partially mitigating alternative.

To be sure, the FEC's explanation was far from ideal, and it is more difficult to discern its analytical path on this point. For instance, what are the Department of Labor's disclosure requirements, and how much more burdensome was the existing rule? The IRS's? Would different rules for nonprofits solve most concerns? What is actually more burdensome about disclosing all donations as opposed to only a subset of donations? And does that justify a change in policy that will have a markedly decreased effect on the amount of disclosures? The answers to these questions may exist and may likely support the rule, but the FEC's explanation did not provide them. Ultimately, however, *State Farm*'s standard is "[n]ot particularly demanding," and the FEC's burden rationale leaves just enough detail for us to see "what major issues of policy were ventilated and why the agency reacted to them as it did." *Republican Nat'l Cmte v. FEC*, 76 F.3d 400, 407 (D.C. Cir. 1996).

3. The Privacy Rationale

The FEC's final explanation centered on its effort to tailor the regulations such that they both effectuate BCRA's purpose in disclosure while also minding carefully the constitutional interests in privacy also at stake. The FEC reasoned that the revised purpose requirement is "narrowly tailored to address many of the commenters' concerns regarding individual donor privacy." 72 Fed. Reg. at 72901.

This explanation is significant. The FEC is "[u]nique among federal administrative agencies," having "as its sole purpose the regulation of core constitutionally protected activity—the behavior of individuals and groups only insofar as they act, speak and associate for political purposes." *AFL-CIO v. FEC*, 333 F.3d 168, 170 (D.C. Cir. 2003). Thus, more than other agencies whose primary task may be limited to administering a particular statute, every action the FEC takes implicates fundamental rights. By tailoring the disclosure requirements to satisfy constitutional interests in privacy, the FEC fulfilled its unique mandate.

And the FEC's concerns about the competing interests in privacy and disclosure were legitimate. We began this opinion by acknowledging the unmistakable tension that exists in campaign finance law between speech rights and disclosure rules. The Supreme Court has vigorously protected the public's right to speak anonymously, even recognizing that anonymous speech has "played an important role in the progress of mankind." *Talley v. California*, 362 U.S. 60, 64 (1960). "Anonymity," the Court elsewhere observed, "is a shield from the tyranny of the majority" and "exemplifies the purpose behind the Bill of Rights and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). This is not to say the Court is naïve to the potential downsides that may accompany this right to anonymity. Much to the contrary, the *McIntyre* Court acknowledged "political speech by its nature will sometimes have unpalatable consequences," but, vindicating the right to speak anonymously, declared "our society accords greater weight to the value of free speech than to the dangers of its misuse." *Id.*

And yet, the Court has sanctioned startling intrusions on this right to anonymity by upholding mandatory disclosure requirements. The Court held in *Buckley* that such requirements "appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist," all the while recognizing "public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute" and "expose contributors to harassment or retaliation." 424 U.S. at 68. Ironically, these two values the *Buckley* Court acknowledged would be harmed by the disclosure requirements were the very same values the *McIntyre* Court later believed "exemplifie[d] the purpose behind the Bill of Rights and of the First Amendment in particular"—namely, "protect[ing] unpopular . . . ideas from suppression" and "individuals from retaliation." *McIntyre*, 514 U.S. at 357. But even after *McIntyre*, the Court upheld the disclosure requirements in *McConnell*, and again in *Citizens United*, without much more than a passing citation to *McIntyre* or any of the Court's other precedents establishing the right to speak anonymously.[6] As one dissenting justice observed in *McConnell*, "The Court now backs away from [*McIntyre*], allowing the established right to anonymous speech to be stripped away based on the flimsiest of justifications." 540 U.S. at 276 (Thomas, J. dissenting).

Both an individual's right to speak anonymously and the public's interest in contribution disclosures are now firmly entrenched in the Supreme Court's First Amendment jurisprudence. And yet they are also fiercely antagonistic. The

---

[6] Judge Easterbrook, dubitante in *Majors v. Abell*, 361 F.3d 349, 356 (7th Cir. 2004), also noted "the Justices' failure to discuss *McIntyre*" and concluded it was therefore "impossible for courts at our level to make an informed decision—for the Supreme Court has not told us what principle to apply."

deleterious effects of disclosure on speech have been ably catalogued. "Disclaimer and disclosure requirements enable private citizens and elected officials to implement political strategies *specifically calculated* to curtail campaign-related activity and prevent the lawful, peaceful exercise of First Amendment rights." *Citizens United*, 558 U.S. at 483 (Thomas, J., dissenting) (highlighting how mandatory disclosure of contributors to California's controversial "Yes on Proposition 8" campaign led to their being singled out for ruthless retaliation and intimidation). "[T]he advent of the Internet enables prompt disclosure of expenditures, which provides political opponents with the information needed to intimidate and retaliate against their foes." *Id.* at 484 (internal quotation marks omitted). "Disclosure also makes it easier to see who has not done his bit for the incumbents, so that arms may be twisted and pockets tapped." *Majors v. Abell*, 361 F.3d 349, 356 (7th Cir. 2004) (Easterbrook, J., dubitante).

In addition to these general burdens, the specific disclosure requirement Van Hollen advocates here would present its own unique harms. For instance, an American Cancer Society donor who supports cancer research but not ACS's political communications must decide whether a cancer cure or her associational rights are more important to her. This is categorically distinct from deciding whether a political issue, such as tax reform, is as important as one's associational right. Cancer research isn't a political issue, but disclosure rules of this sort would undeniably transform it into one. These disclosure rules also burden privacy rights in another crucial way: modest individuals who'd prefer the amount of their charitable donations remain private lose that privilege the minute their nonprofit of choice decides to run an issue ad. The Supreme Court routinely invalidates laws that chill speech far less than a disclosure rule that might scare away charitable donors. *See Watchtower Bible and*

*Tract Soc'y of New York, Inc. v. Stratton*, 536 U.S. 150 (2002) (striking a law requiring religious canvassers to obtain a permit before advocating door-to-door on private property).

The ones who would truly bear the burden of Van Hollen's preferred rule would not be the wealthy corporations or the extraordinarily rich private donors that likely motivated Congress to compel disclosure in the first place. Such individuals would have "little difficulty complying" with these laws, as they can readily hire "legal counsel who specialize in election matters," who "not only will assure compliance but also will exploit the inevitable loopholes." *Majors*, 361 F.3d at 357–58 (Easterbrook, J., dubitante). Instead, such requirements "have their real bite when flushing small groups, political clubs, or solitary speakers into the limelight, or reducing them to silence." *Id.* at 358.

By affixing a purpose requirement to BCRA's disclosure provision, the FEC exercised its unique prerogative to safeguard the First Amendment when implementing its congressional directives. *See AFL-CIO*, 333 F.3d at 170. Its tailoring was an able attempt to balance the competing values that lie at the heart of campaign finance law. We therefore do not find this rationale inadequate.

\* \* \*

At the close of its explanation, the FEC succinctly defended its decision to adopt a purpose requirement for corporate and union electioneering communications:

> In the Commission's judgment, requiring disclosure of funds received only from those persons who donated specifically for the purpose

> of furthering [electioneering communications] appropriately provides the public with information about those persons who actually support the message conveyed by the [electioneering communications] without imposing on corporations and labor organizations the significant burden of disclosing the identities of the vast numbers of customers, investors, or members, who have provided funds for purposes entirely unrelated to the making of [electioneering communications].

72 Fed. Reg. at 72911. In light of its three rationales—the support, burden, and privacy rationales—we conclude the FEC's purpose requirement is neither arbitrary nor capricious.

## III

Holding, as we do here, that the FEC's purpose requirement satisfies both *Chevron* Step Two and *State Farm* review has the benefit both of being a correct application of black letter administrative law *and* of forestalling to some other time an answer to the important constitutional questions bubbling beneath the surface of this case. As our discussion of the FEC's rule has shown, the Supreme Court's campaign finance jurisprudence subsists, for now, on a fragile arrangement that treats speech, a constitutional right, and transparency, an extra-constitutional value, as equivalents. But "the centre cannot hold." William Butler Yeats, *The Second Coming* (1919). Until then, however, the FEC's purpose requirement survives, and the judgment of the district court is therefore

*Reversed.*